**TAX COURT OF NEW JERSEY**

**JOSHUA D. NOVIN**
**Judge**



Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

May 24, 2023

Mr. and Mrs. Daniel Yang
91 Lincoln Street
Montclair, New Jersey 07042

Dominic DiYanni, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Building A
Warren, New Jersey 07059-4922

> Re:     Yang, Daniel & Lucy v. Montclair Twp.
>         Docket Nos. 000114-2022 and 005720-2022

Dear Mr. and Mrs. Yang and Mr. DiYanni:

This letter constitutes the court's opinion following trial in the above-captioned matters challenging the 2021 tax year added assessment and 2022 tax year local property assessment on plaintiffs' single-family residence.

For the reasons stated more fully below, the court affirms the 2021 tax year added assessment and 2022 tax year local property assessment.

## I.     Procedural history and factual findings

Daniel Yang and Lucy Yang ("plaintiffs") are the owners of the single-family residence located at 91 Lincoln Street, Montclair Township, Essex County, New Jersey.  The property is identified on Montclair Township's ("Montclair") municipal tax map as block 4102, lot 17 (the "subject property").

Plaintiffs purchased the subject property on March 4, 2021, for $1,230,000.  According to plaintiffs, the seller, 88 Sanford St., LLC ("seller"), acquired the subject property in May 2019






for $375,000. Thereafter, the seller applied for several construction permits and undertook extensive renovations to the subject property. The renovations and alterations took approximately twenty (20) months and were completed before closing. On March 2, 2021, Certificates of Approval were issued by Montclair's Building Department for the renovations and improvements.

On or about October 1, 2021, a 2021 tax year added assessment of $680,600 (prorated to $510,450 for the period April to December 2021) was imposed on the subject property due to the extensive renovations and alterations completed.[1]

Thereafter, plaintiffs filed a petition of appeal with the Essex County Board of Taxation challenging the 2021 tax year added assessment.[2] On December 29, 2021, the Essex County Board of Taxation issued a Memorandum of Judgment ("Judgment") affirming the 2021 tax year added assessment.

On or about January 21, 2022, plaintiffs timely filed a complaint with the Tax Court contesting the Judgment and the 2021 tax year added assessment.

On March 30, 2022, plaintiffs timely filed a direct appeal complaint with the Tax Court contesting the subject property's 2022 tax year local property assessment.

For the 2021 tax year, the subject property's prorated added tax assessment was $510,450, and for the 2022 tax year, the subject property's local property tax assessment was $1,043,100 (land $210,000 and improvements $833,100).[3]

---

[1] N.J.S.A. 54:4-63 provides, in part, that "[o]n October first following the assessor shall file the added assessment list and a true copy thereof, to be called the assessor's added assessment duplicate, with the county board of taxation." N.J.S.A. 54:4-63.

[2] N.J.S.A 54:4-63.11 provides, in part, that "[a]ppeals from added assessments may be made to the county board of taxation on or before December 1 of the year of levy, or 30 days from the date the collector of the taxing district completes the bulk mailing of tax bills for added assessments, whichever is later." N.J.S.A. 54:4-63.11.

[3] The Chapter 123 average ratio for Montclair for the 2021 tax year is 88.05% and for the 2022






During trial, plaintiffs, self-represented litigants, offered testimony and submitted comparable sales information: (i) for the 2021 tax year, of four (4) single-family residences sold in Montclair; and (ii) for the 2022 tax year, of three (3) single-family residences sold in Montclair. In response, Montclair offered factual testimony from its municipal tax assessor with respect to the 2021 tax year added assessment, and valuation opinion testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court as an expert in the property valuation field. Montclair's expert prepared an appraisal report only for the 2022 tax year.

Based on the evidence presented, the court concludes that the subject property is a 2½ story Victorian-style colonial, single-family residence constructed in approximately 1897, situated on a .2754-acre rectangular shaped lot. The subject property's lot is approximately 60' wide and 200' deep.

The interior and exterior photographs of the subject property depict a newly renovated and fully restored single-family residence containing numerous high-end finishes, features, and amenities. The home possesses a gross living area of 3,248 square feet, consisting of 5 bedrooms, 3 full bathrooms, and 2 half-bathrooms.[4] The first floor of the home features a foyer, an eat-in kitchen, dining room, living room, half-bathroom, butler's pantry, mudroom, laundry room, and a family room/study with French doors and a tray ceiling. The second floor of the home includes the master bedroom, an ensuite master bathroom, two additional bedrooms, and an additional full bathroom. The third floor includes two bedrooms and one full bathroom. The subject property's kitchen features new white kitchen cabinetry with crown molding and quartz countertops, a faux marble porcelain tile backsplash, a 7' island with a quartz countertop (featuring pendant lighting,

---

tax year is 82.54%. See N.J.S.A. 54:1-35a(a).

[4] One of the half bathrooms is in the subject property's finished basement.






cabinetry, and seating for four), and stainless-steel appliances. The butler's pantry features new white cabinetry, a quartz countertop, a sink, and a wine refrigerator. The laundry room features dark wood cabinetry and a farmhouse-style sink. The dining room features a stained-glass window. The living room features a brick fireplace with a wood mantle. The master ensuite bathroom features a double vanity, walk in shower and bathtub, all finished with porcelain faux marble tile. New hardwood flooring is installed throughout the home. The basement is partially finished with a family room/playroom, a half-bathroom, 9' ceilings, recessed lighting, and wood composite flooring. In addition, the subject property also features a large front porch with Trex composite decking, a vinyl fenced-in backyard (approximately five-feet high), a rear brick patio, and a two-car detached garage.

The testimony and evidence further revealed that the renovation and restoration of the subject property included the installation of: (i) new exterior vinyl siding; (ii) a new roof; (iii) two new HVAC systems (along with associated ductwork); (iv) new windows throughout the home; (v) a new sewer line; and (vi) a new natural gas line.

The subject property is situated in southeast Montclair, approximately one block from the border of Montclair and Glen Ridge, two blocks from Glenfield Park, and five blocks from the Glen Ridge commuter rail station.

The subject property is in Montclair's R-1, Single Family Residential Zone district. Thus, the subject property is a legally permitted and conforming use within the zoning district. In addition, the subject property is in Flood Hazard Zone X, denoting an area of minimal flooding risk.

   

## II. Conclusions of law

### a. Presumption of validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Bor., 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence which raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376. "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of plaintiffs' proofs, Montclair moved to dismiss these matters under R. 4:37-2(b), arguing that plaintiffs failed to overcome the presumption of validity. Montclair acknowledged that plaintiffs submitted comprehensive comparable sales data of other single-family residences sold in Montclair as of each valuation date at issue.[5] However, Montclair

---

[5] In accordance with R. 8:6-1(b)(2), requiring that "[a] party intending to rely on sales . . . of comparable properties shall furnish each opposing party with a list of comparable sales . . .






maintained that "comparison for valuation purposes requires an analysis of [the] similarities and differences that affect value, for example, sale terms, market conditions, or physical characteristics. Market evidence must support any element of comparison that causes value differences," citing Appraisal Institute, The Appraisal of Real Estate (14th ed. 2013). Thus, Montclair argued that because plaintiffs did not offer testimony from a duly qualified valuation expert reconciling the differences and similarities between the subject property and the seven comparable sales, including how the marketplace would account for those differences, the plaintiffs failed to overcome the presumption of validity that attaches to the local property tax assessments.

In the instant matter, plaintiffs are not appraisers nor real estate valuation experts, but rather are self-represented litigants, and thus, are precluded from offering valuation opinions and applying adjustments to the comparable sales. See N.J.R.E. 702; N.J.R.E. 703. However, taxpayers "are not required to provide an expert witness and an appraisal report [at trial]. [Thus, a] taxpayer would appear to be at a grave disadvantage against an appraisal expert's testimony along with an appraisal report." Cohn v. Livingston Twp., 18 N.J. Tax 429, 433 (Tax 1999); see also Siegfried O. v. Holmdel Twp., 20 N.J. Tax 8, 18 (Tax 2002) (concluding that "the use of expert testimony and appraisal reports to prove value in tax appeals is optional, not mandatory. Indeed, the Tax Court has held that litigants are not required to produce an expert witness or an appraisal report").

---

intended to be established by proof which list shall set forth as to each sale . . . the location of the property by block, lot, street, street number and municipality and, as to each sale, the name of seller and purchaser, date of sale, the consideration, book and page number of the recording of the deed and, if available, the form SR1A identification number of the Division of Taxation," the plaintiffs provided Montclair and the court with the aforesaid information.





Moreover, matters assigned to the Tax Court's Small Claims Division permit hearings to be conducted,

> informal[ly], and the judge may receive evidence as the judge deems appropriate for a determination of the case, except that all testimony shall be given under oath. A party may appear on the party's own behalf or by an attorney or by any other person as may be provided by the Rules of the Supreme Court.
>
> [N.J.S.A. 2B:13-15.]

Our Rules of Court further emphasize that,

> The general rules of practice and procedure in the Tax Court shall apply to the small claims division, except as otherwise provided in Part VIII . . . the hearing shall be informal and the court may hear such testimony and receive such evidence as it deems necessary or desirable for a just and equitable determination of the case. All testimony shall be given under oath and a verbatim record shall be made of the proceeding.
>
> [R. 8:11(b) (emphasis added).]

The court finds, as succinctly expressed by Judge Kahn, that "[t]his court construes said statute and rule as authorizing the Tax Court to consider reliable evidence from a pro se litigant, even though such evidence is not derived from expert opinion." Cohn, 18 N.J. Tax at 433.

Moreover, although the presumption of validity is applied equally to trials involving self-represented litigants and trials where attorneys and qualified valuation experts have been retained, the court is nonetheless mindful that the cogent evidence threshold, and the parameters for consideration of the evidence presented, when faced with a R. 4:37-2(a) motion, is modest. When evaluating whether the evidence presented meets the cogent evidence standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)).






Here, plaintiffs presented evidence of seven comparable sales of single-family residences in Montclair that sold between August 2020 and October 2021. The comparable sales range in size from 2,898 to 4,588 square feet, possess between 3½ to 4½ bathrooms, contain land areas from .20 acres to .55 acres, and, except for two sales, bear a similar construction date, having been originally constructed between 1897 to 1922.[6] The unadjusted sale prices of the seven comparable single-family residences was $886,891 to $1,085,000, or between $215.78 to $338.85 per square foot of living area.[7] The comparable sales are located between .3 to 2.1 miles from the subject property.

Therefore, although plaintiffs' evidence was limited, insofar that no data or evidence was presented accounting for differences between the subject property and the comparable properties, gauging the evidence presented against the liberal standards embodied under R. 4:37-2(b), the court found that plaintiffs produced cogent evidence sufficient to overcome the presumption of validity. Accordingly, the court denied Montclair's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the 2021 tax year added assessment or 2022 tax year local property tax assessment is erroneous. The court must then "turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). Here, although the proofs, when measured against the liberal standards to be employed in evaluating a motion under R. 4:37-2(b),

---

[6] The two exceptions were a single-family residence completed in 2019 and the other, a single-family residence completed in 2002.
[7] Having a mean value of $285.90 per square foot and median value of $281.10 per square foot.





were sufficient to overcome the presumption of validity at the close of plaintiffs' case-in-chief, "the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

    b.    Highest and best use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, Montclair's expert opined that the subject property's highest and best use, as improved, was the continuation of use as a single-family residence. After hearing the testimony from Mr. Yang and Montclair's expert about the subject property's zoning, current use, market, and neighborhood, the court finds that the subject property's highest and best use, as improved, is as a single-family residence.

    c.    Subject property sale

In the court's journey to determine the true or fair market value of real property, the focus of the inquiry is "the price a willing buyer would pay a willing seller." New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543 (1963). The term market value has been defined as:

> the most probable price, as of a specified date, in cash or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in






>a competitive market under all conditions requisite to a fair sale,
>with the buyer and seller each acting prudently, knowledgeably, and
>for self-interest, and assuming that neither is under undue duress.
>
>[The Appraisal of Real Estate at 58.]

Thus, although the sale of a property reflects an exchange of consideration between parties, it may not always be dispositive on the issue of market value. "[T]here may be instances when the sale price may not reflect true market value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value." Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 282 (1985).

According to Mr. Yang, when the subject property was listed for sale on the Garden State multiple listing service in January 2021, it was a "unique time" because of the COVID global pandemic and stay-at-home restrictions. Mr. Yang characterized the process of purchasing the subject property as a "blind auction bidding process, where individuals bid for a given house," without knowing if, and what other prospective purchasers may have submitted as offers to purchase the property. Thus, Mr. Yang contends that plaintiffs' March 2021 purchase of the subject property for $1,230,000 "was not necessarily indicative of the true market value."

Mr. Yang further credibly testified that during the two years prior to submitting his offer to purchase the subject property, he reviewed single-family residence listings in Montclair. Moreover, in the year prior to purchasing the subject property, he had "thoroughly researched" the single-family residential market in Montclair. In addition, in the six months leading up to plaintiffs' purchase of the subject property, plaintiffs actively attended showings of single-family residences offered for sale in Montclair. Mr. Yang further credibly testified that before consummating the purchase of the subject property, plaintiffs had submitted offers to purchase five other single-family residences in Montclair, however, none of those purchase attempts were






successful.

Significantly, in support of his contention that the subject property's purchase price did not accurately reflect market value, Mr. Yang testified that "I was the highest bidder of course, . . . I was $130,000 higher than the next best offer, so I think that alone should . . . show that the purchase price is not the only data point," to be used in determining a property's value and tax assessment. Mr. Yang further offered that "I was comfortable bidding well above" the subject property's listing price, "I bid over a hundred thousand dollars more than the next best bidder." Thus, in Mr. Yang's estimation, he "overpaid" when purchasing the subject property for $1,230,000.

However, Montclair's expert testified that in preparing his appraisal report and researching the subject property's sale, he spoke twice with the subject property's selling realtor, Mr. DiBenedetto. During those discussions, Mr. DiBenedetto revealed that plaintiffs' $1,230,000 offer to purchase the subject property was not the highest offer received by the seller. Rather, an offer was apparently received that exceeded the plaintiffs offer, however the seller elected to proceed with plaintiffs' offer because it contained a "stronger down payment, he [Mr. Yang] had . . . waived certain inspections and . . . his [Mr. Yang's] terms were better and he [Mr. Yang] was able to close more quickly."

In response to Montclair's expert's testimony, Mr. Yang submitted that Mr. DiBenedetto's recollection that there was a higher bid was "inaccurate." According to Mr. Yang, "the other bid that they [the seller] were considering was an all-cash bid, that was lower [than plaintiffs' bid] and that they [the seller] used my bid to get the other person higher." Moreover, Mr. Yang expressed that "it took about 36 hours of . . . on-going negotiations . . . and that I had to increase my bid, kind of, in the final hours to secure the level, but then after they awarded it to me, I [plaintiffs] backed out."






Notably, in response to the court's questions, Mr. Yang acknowledged that plaintiffs were represented by Mr. DiBenedetto, a licensed New Jersey real estate agent, in identifying the subject property and in submitting plaintiffs' offer to purchase the subject property. Mr. Yang further testified that plaintiffs were represented by a New Jersey licensed real estate attorney in connection with the negotiation of the purchase contract, and the closing of title to the subject property.

Evidence elicited during trial from Mr. Yang and Montclair's expert also disclosed that the subject property was listed for sale on the Garden State multiple listing service on or about January 22, 2021, the seller's real estate agent was Gary Martin of BHHS – New Jersey Properties, it was offered for an initial listing price of $979,000, was identified as being under contract on February 2, 2021, and sold for approximately 25.63% above the listing price.

Montclair's expert further provided testimony that, according to Garden State multiple listing records, from January to December 2021, there were 186 single-family residences with "5+" bedrooms listed for sale and sold in Montclair on average for 18% above the listing price. Montclair's expert further offered testimony that based on his discussions with realtors active in the Montclair marketplace, most single-family residences are being offered for sale at a listing price that is designed to "encourage a bidding war and 99% of the time there is a bidding war for properties in Montclair."

Mr. Yang further testified that no special or creative financing was involved in the plaintiffs' purchase of the subject property and that plaintiffs applied for and received traditional purchase money mortgage loan financing. Additionally, no special or unique terms were involved in the plaintiffs purchase of the subject property, and the seller did not agree to perform any additional services for plaintiffs. Importantly, Mr. Yang testified that there were "no external forces," coercion, or duress involved in plaintiffs' decision to purchase the subject property.






Moreover, no evidence was elicited during trial that the seller was experiencing any financial pressures or duress.

For the sale of a property to be a trustworthy and reliable indicator of fair market value, the following criteria must be met:

1) buyer and seller are typically motivated, and neither is under duress;
2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
4) the purchase price is paid in cash or its equivalent; and
5) the purchase price is unaffected by special or creative financing or by other special factors, agreements, or considerations.

[Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J. Tax 108, 126 (Tax 2013); see also Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 94 (Tax 1996)).]

Here, the evidence disclosed that plaintiffs were typically motivated to purchase a single-family residence in Montclair, and the seller was typically motivated to sell the subject property. Mr. Yang credibly testified that plaintiffs were not suffering from any duress in purchasing the subject property, and no evidence was presented that the seller was under duress.

Mr. Yang further credibly testified regarding his familiarity with the Montclair single-family residential market, detailing that two-years prior to purchasing the subject property he had been reviewing listings of single-family residences in Montclair. Moreover, Mr. Yang emphasized that he had "thoroughly researched" the single-family residential market in Montclair. Additionally, Mr. Yang testified that during the six-month period leading up to plaintiffs' purchase of the subject property, plaintiffs actively attended showings of single-family residences offered for sale in Montclair.

Plaintiffs further retained a licensed real estate salesperson to assist them in identifying and






submitting not only their offer to purchase the subject property, but in presenting five other offers to purchase a single-family residence in Montclair. In addition, plaintiffs were represented in the negotiation of the purchase contract and consummation of the purchase of the subject property by a licensed New Jersey attorney.

Moreover, the trial evidence disclosed that the subject property was reasonably exposed to an open and competitive marketplace for a reasonable time-period. The subject property was marketed for sale on a multiple listing service and multiple offers to purchase the subject property were received.

After evaluating and considering all of the foregoing testimony and evidence, the court is satisfied that the March 4, 2021 sale of the subject property for $1,230,000 is a trustworthy and reliable indicator of the subject property's true or market value. Despite Mr. Yang's clear frustration and contempt for the home buying process, plaintiffs were willing buyers, the seller was a willing seller, each acted prudently, the plaintiffs and seller were typically motivated, not suffering from financial or other forms of duress, the subject property was adequately exposed to an open market, and the purchase price was paid traditionally, and was not affected by special factors.

    d.    <u>Added Assessment</u>

On October 1st each year, each municipal tax assessor is charged with the responsibility of filing an added assessment list with the county board of taxation. N.J.S.A. 54:4-63.5. The added assessment list should include all property in the taxing district where an addition, renovation, or improvement was completed since January 1st of the current tax year. The added assessment is prorated from the 1st day of the next month succeeding the day that the improvement was completed through December 31st of the current tax year. N.J.S.A. 54:4-63.3. The county board


Interpreter

ADA
Americans with Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


of taxation certifies the added assessment list by October 10th and the added assessment and associated tax bills are delivered "at least one week before November first." N.J.S.A. 54-63.7.

Here, plaintiffs argue Montclair impermissibly applied the Chapter 123 average ratio to the subject property's purchase price to arrive at the 2021 added assessment and 2022 tax year assessment for the subject property.[8] This discriminatory assessing method, detailed in Twp. of West Milford v. Van Decker, 120 N.J. 354, 361-62 (1990), is commonly known as the "Welcome Stranger" practice.

In response, Montclair offered testimony from George Librizzi, CTA, Montclair's municipal tax assessor. Mr. Librizzi testified that he has been a certified tax assessor in New Jersey for thirty-six years and has served as Montclair's municipal tax assessor since November 2015. Mr. Librizzi offered that he imposed the added assessment because Montclair's Building Department notified him that Certificates of Approval were issued on March 2, 2021, for improvements and renovations undertaken to the subject property.

In detailing the process undertaken in determining how an added assessment is imposed, Mr. Librizzi explained that Montclair retains Hendricks Appraisal Company, LLC to conduct a field inspection of each property to examine the scope and nature of the additions, alterations, and improvements. However, if access is not afforded to conduct a field inspection, a review of the building department plans and building permits issued is undertaken.[9] Following such inspection

---

[8] According to Mr. Yang, following the levy of the 2021 added assessment, Mr. Yang engaged in a discussion with George Librizzi, CTA, Montclair's municipal tax assessor, at Mr. Librizzi's office. Mr. Yang testified that during that discussion, Mr. Librizzi stated that he applied Montclair's 2021 Chapter 123 average ratio to the subject property's sale price to arrive at the 2021 added assessment and 2022 tax assessment.

[9] The testimony of Mr. Yang and Mr. Librizzi confirmed that, initially, plaintiffs did not afford access for a field inspection. However, subsequently, plaintiff allowed Mr. Librizzi to conduct an inspection on October 25th.






or review, the data or information about the renovations, improvements, or alterations are entered into Montclair's "Computer Assisted Mass Appraisal system, which is essentially the New Jersey Real Property Appraisal Manual, . . . and we arrive at a revised assessment." The next step is collecting comparable sales data "to verify . . . that the revised assessment calculated in the software is fair and equitable. Once the information is verified and the new assessment is right, we subtract it from the original assessment and that becomes the added assessment, the difference of those two numbers." According to Mr. Librizzi, the foregoing procedure was utilized to determine the subject property's 2021 tax year added assessment and 2022 tax year assessment. Mr. Librizzi further testified that the subject property's 2021 tax year added assessment was prorated from April to December 2021, the first day of the month following issuance of the March 2, 2021 Certificates of Approval by Montclair's Building Department.

Mr. Librizzi flatly rejected plaintiffs' contention that his office applied Montclair's 2021 Chapter 123 average ratio to the subject property's sale price to discern the 2021 tax year added assessment and 2022 tax year assessment. Referencing the Supreme Court's decision in Twp. of West Milford v. Van Decker, Mr. Librizzi testified that, "it's basic knowledge that an assessor never does that [apply the Chapter 123 ratio to the sale price], you actually have to do the procedures that I outlined to you in my testimony a few minutes ago." Mr. Librizzi further offered that, "certainly it's never been my practice, to just apply a ratio, that is the complete wrong way to do it and its not done that way."

Importantly, during cross-examination Mr. Yang admitted that contrary to his contentions, multiplication of Montclair's Chapter 123 average ratio to the subject property's $1,230,000 purchase price did not equal either the 2021 tax year added assessment, or the 2022 tax year assessment levied on the subject property.






Our Supreme Court has expressly recognized that,

> A municipality may revise assessments in years other than years of municipal-wide revaluation for legitimate reasons. See, e.g., Handbook for New Jersey Assessors, New Jersey State Div. of Taxation (1989) sec. 902.2 (increased property value based on new improvements), . . . However, under no circumstances can appraised valuation of property be increased merely because it has been sold.

> [Van Decker, 120 N.J. at 362 (emphasis added).]

Here, the record reveals that Mr. Librizzi possessed a legitimate, non-sale related reason to reassess the subject property, the completion of extensive renovations and improvements and corresponding issuance of Certificates of Approval on March 2, 2021, by Montclair's Building Department. Such reassessment of the subject property comports not only with our Supreme Court's holding in Van Decker, but with a municipal tax assessor's statutory and constitutional duty to value all property within the taxing district based on the same standard of value. See N.J. Const. art. VIII, § 1, ¶ 1(a); N.J.S.A. 54:4-23.

The court finds Mr. Librizzi's testimony credible that, the subject property's 2021 tax year added assessment and 2022 tax year assessment were calculated utilizing Montclair's Computer Assisted Mass Appraisal system based on data, information, and improvements found to exist in the subject property, and not by application of Montclair's Chapter 123 average ratio to the subject property's purchase price. Moreover, Mr. Librizzi's testimony that the Computer Assisted Mass Appraisal system generated the 2021 tax year added assessment and 2022 tax year assessment data is further supported by the court's review of the subject property's property record card, a copy of which was included in plaintiffs' submissions. The subject property's property record card reflects the renovations undertaken to the subject property and that, due to those improvements, the subject property was deemed to have an overall effective age of 2015.






In sum, the court finds that no credible evidence was presented by plaintiffs demonstrating that Mr. Librizzi engaged in the discriminatory "Welcome Stranger" practice or applied Montclair's Chapter 123 average ratio to the subject property's sale price to derive the 2021 tax year added assessment or 2022 tax year assessment.

e.      Valuation approach

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). "[T]he answer as to which approach should predominate depends upon the facts in the particular case." WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

Both plaintiffs and Montclair's expert relied on the sales comparison approach to derive the subject property's estimated true or market value. The court finds that the sales comparison approach is the most appropriate method to determine the subject property's true or market value.

1.      Sales comparison approach

The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." The Appraisal of Real Estate at 377. The sales comparison approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378. "When data is available, this [approach] is the most straight forward and simple way to explain and support an opinion of






market value." Greenblatt, 26 N.J. Tax at 53 (citing Appraisal Institute, The Appraisal of Real

Estate, 300 (13th ed. 2008)).

    a.    Plaintiffs' evidence

As set forth above, plaintiffs offered evidence of seven comparable sales of single-family

residences sold in Montclair between August 2020 and October 2021.

The following chart identifies the four comparable sales and sets forth basic details of each

property relied upon by plaintiffs for the 2021 tax year:

| Comparable | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Location | 8 Lewis Court Montclair, NJ | 27 Madison Ave. Montclair, NJ | 39 High Street Montclair, NJ | 188 Grove Street Montclair, NJ |
| Sale date | August 28, 2020 | September 30, 2020 | August 25, 2020 | August 20, 2020 |
| Sale price | $975,473 | $990,000 | $886,891 | $949,000 |
| Price p.s.f. | $259.99 p.s.f. | $215.78 p.s.f. | $253.40 p.s.f. | $322.57 p.s.f. |
| G.L.A. | 3,752 sq. ft. | 4,588 sq. ft. | 3,500 sq. ft. | 2,942 sq. ft. |
| Bedrooms/Baths | 5/4.1 | 4/3.1 | 5/3.1 | 5/4.1 |
| Lot size | .22 acres. | .39 acres | .55 acres | .20 acres |
| Age/Eff. Age | 2019/2019 | 2002/2006 | 1907/1996 | 1912/2015 |
| Basement | Partially finished | Unfinished | Unfinished | Partially finished |
| Garage | 2-car attached | 2-car attached | 2-car detached | 2-car detached |

The following chart identifies the three comparable sales and sets forth basic details of each

property relied upon by plaintiffs for the 2022 tax year:

| Comparable | #1 | #2 | #3 |
|---|---|---|---|
| Location | 41 Cambridge Rd. Montclair, NJ | 22 McDonough Street Montclair, NJ | 54 Tuxedo Rd. Montclair, NJ |
| Sale date | October 8, 2021 | March 22, 2021 | August 26, 2021 |
| Sale price | $941,976 | $1,085,000 | $982,000 |
| Price p.s.f. | $281.10 p.s.f. | $329.59 p.s.f. | $338.85 p.s.f. |
| G.L.A. | 3,351 sq. ft. | 3,292 sq. ft. | 2,898 sq. ft. |
| Bedrooms/Baths | 5/3.1 | 5/3.1 | 4/3.2 |
| Lot size | .29 acres. | .25 acres | .22 acres |
| Age/Eff. Age | 1922/2006 | 1897/1999 | 1922/2015 |
| Basement | Partially finished | Unfinished | Partially finished |
| Garage | 2-car detached | 2-car detached | 2-car detached |

To arrive at their estimated value for the subject property for the 2021 tax year, plaintiffs

averaged the sale prices of the four 2021 comparable sales, and to arrive at their estimated value






for the 2022 tax year, plaintiffs averaged the sale prices of the three 2022 comparable sales.

      b.    Montclair's evidence

Montclair's expert identified four single-family residence sales that he deemed comparable to the subject property, as of the October 1, 2021 valuation date. Montclair's expert testified that he verified each sale with the selling real estate agent in each transaction. In addition, Montclair's expert's report included an exterior photograph of each comparable sale.

The following chart identifies the four comparable sales and sets forth basic details of each property relied upon by Montclair's expert:

| Comparable | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Location | 47 Woodland Ave. Montclair, NJ | 86 Willowdale Ave. Montclair, NJ | 32 Oxford Street Montclair, NJ | 26 Draper Terrace Montclair, NJ |
| Sale date | November 8, 2021 | March 15, 2021 | September 20, 2021 | April 29, 2021 |
| Sale price | $995,000 | $940,000 | $1,051,000 | $1,349,902 |
| Price p.s.f. | $507.91 p.s.f. | $448.47 p.s.f. | $482.77 p.s.f. | $405.62 p.s.f. |
| G.L.A. | 1,959 sq. ft. | 2,096 sq. ft. | 2,177 sq. ft. | 3,328 sq. ft. |
| Lot size | .1501 acres. | .2216 acres | .2249 acres | .4348 acres |
| Age/Renovated | 1926/2021 | 1923/2018 | 1921/2005 | 1897/2017 |
| Basement | Unfinished | Unfinished | Unfinished | Partially finished |
| Garage | 1-car detached | None | 2-car detached | 2-car detached |

Montclair's expert applied the following upwards adjustments to the comparable sales: (i) $40,000, to account the lack of a 2-car garage; (ii) $45,000, to account for the lack of an additional full bathroom; and (iii) $200.00 per square foot of living area. In Montclair's expert's opinion, no adjustment was warranted for the lack of a partially finished basement in comparable sales 1, 2, and 3. Montclair's expert testified that he derived the 2-car garage, full bathroom, and gross living area adjustments by performing a paired sale analysis.

After applying his upward adjustments for a 2-car garage, full bathroom, and gross living area, Montclair's expert concluded the following adjusted sale prices: (i) $1,292,800, comparable sale 1; (ii) $1,255,400, comparable sale 2; (iii) $1,310,200, comparable sale 3; and (iv) $1,333,902, comparable sale 4. Reconciling the adjusted sales prices, Montclair's expert concluded a true or






market value for the subject property of $1,285,000, as of the October 1, 2021 valuation date.

        c.     Court's analysis

At the outset, the court highlights that plaintiffs did not confer with the sellers, the purchasers, the real estate salesperson/brokers, or the attorneys for any of the seven (7) comparable sale transactions that they utilized. Thus, the court has reason to question the accuracy of the sale data and whether these sales are trustworthy and reliable indicators of fair market value. A pivotal aspect of the sales comparison approach is "verify[ing] the integrity of the [sales] information by 'confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.'" VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 561 (Tax 2017) (quoting The Appraisal of Real Estate at 381); see also N.J.S.A. 2A:83-1.

The comparable sales approach involves investigation and research of the competitive marketplace for "information on properties that are similar to the subject property." The Appraisal of Real Estate at 381. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981).

However, by definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Nonetheless, "adjustments must have a foundation obtained from market-derived sources or objective data and not be based on subjective observations and/or personal experience." VBV Realty, LLC, 29 N.J. Tax at 571. In sum, adjustments "must have a foundation obtained






from the market. . . ." Greenblatt, 26 N.J. Tax at 55.

Here, the court highlights that there are several potentially distinguishing factors between plaintiffs' 2021 comparable sales, plaintiffs' 2022 comparable sales, and the subject property, which may have played a material role in establishing their respective purchase prices:

1.    Location

The subject property is conveniently located approximately five blocks and 0.5 miles from Glen Ridge's commuter rail station, an approximate 11-minute walk. However, plaintiffs' 2021 comparable sale 1 is located approximately 1.3 miles from Glen Ridge's commuter rail station, an approximate 27-minute walk, and approximately 1.5 miles from Montclair's Bay Street commuter rail station, also an approximate 27-minute walk.

Similarly, plaintiffs' 2021 comparable sale 3 is located approximately 1.1 miles from Glen Ridge's commuter rail station, an approximate 24-minute walk, and approximately 1.0 mile from Montclair's Bay Street commuter rail station, an approximate 20-minute walk.

Finally, although the court observes that plaintiffs' 2021 comparable sale 4 is located approximately 0.4 miles from Montclair's Walnut Street commuter rail station, an approximate 9-minute walk, it is also located along a county roadway featuring a double-yellow line, in what was characterized by Mr. Yang as a different section of Montclair.[10] Thus, although plaintiffs' 2021 comparable sale 4 features a location similarly distanced from a commuter rail station, the evidence further disclosed that it is located on a much busier and thoroughly traveled roadway.

---

[10] Plaintiffs' evidence disclosed the walking distance each comparable sale bore to the subject property using www.google.com/maps. Although the maps contained in both plaintiffs' evidence and Montclair's expert's report permitted the court to gauge the location of each comparable sale, the court used www.google.com/maps to discern the precise distances of the subject property and plaintiffs' comparable sales to the commuter rail stations.






The court further observes that based on a review of the subject property sale and plaintiffs' seven comparable sales, the single-family residences located in closest proximity to a commuter rail station (91 Lincoln Street - 0.5 miles - $378.69 p.s.f.; 188 Grove Street – 0.4 miles - $322.57 p.s.f.; 54 Tuxedo Road – 0.4 miles - $338.85 p.s.f.; and 22 McDonough Street - 0.6 miles - $329.59 p.s.f), featured the highest value per square foot. Although the court cannot conclusively state that this factor alone contributed to the markedly higher value per square foot of gross living area, it is a well-settled principle of property valuation that location is one of the key factors that drives true or market value.

However, plaintiffs offered no market derived data or evidence that would permit the court to determine the location adjustments that may be necessary or warranted.[11]

### 2. Condition

As detailed above, the subject property was extensively renovated and restored immediately preceding plaintiffs' purchase. As explained by Mr. Librizzi, those renovations resulted in Mr. Librizzi assigning the subject property an "excellent" interior condition and an overall effective age of 2015 on the subject property's property record card.

Conversely, although nicely maintained, the property record card for plaintiffs' 2021 comparable sale 2 reflects a "good" interior condition and an effective age of 2006. Moreover, trial testimony revealed that plaintiffs' 2021 comparable sale 2 was constructed in approximately 2002 and apparently has not been renovated since. The court's review of the interior photographs of plaintiffs' 2021 comparable sale 2 further reveals several dated improvements, most notably in

---

[11] The court attempted to conduct a paired sales analysis between plaintiffs' comparable sales to identify an appropriate location adjustment. However, because of differences in condition, differences in heating and cooling systems, and differences in size, the court was unable to pinpoint an accurate location adjustment.





the master bathroom (bath and shower) and kitchen (island lighting, cabinetry, backsplash). The court further observes that plaintiffs' 2021 comparable sale 2 is an irregularly shaped home, possessing a narrow width and long depth.

Moreover, the court's review of the interior photographs of plaintiffs' 2021 comparable sale 3 discloses that although partially renovated, the home apparently continues to be heated by old cast iron inset radiators. In addition, the court's review of the interior photographs of plaintiffs' 2021 comparable sale 3 does not disclose the presence of any air conditioning ductwork. Moreover, plaintiffs' summary reflects that the air conditioning for comparable sale 3 is "All Separt," suggesting to the court that the home is serviced by only separate window air conditioning units. However, as detailed above, the subject property has two new HVAC units and associated ductwork providing heat and central air conditioning throughout the home.

In addition, the court's review of the interior photographs of plaintiffs' 2022 comparable sale 1 similarly discloses that although the listing states "updated kitchen," no other renovations or improvements were apparently undertaken to the property. Moreover, there is no indication as to when such updating was undertaken. The court's review of the photographs further discloses that plaintiffs' 2022 comparable sale 1 apparently continues to be heated by old cast iron inset radiators. In addition, the court's review of the interior photographs of plaintiffs' 2022 comparable sale 1 discloses some dated improvements, most notably in the full bathroom (tiling and shower doors). The court further emphasizes that no photographs of the master bathroom were included. Therefore, the court questions whether the condition of the master bathroom for plaintiffs' 2022 comparable sale 1 was commensurate with the subject property's newly renovated and updated master bathroom. Finally, the court emphasizes that the listing for plaintiffs' 2022 comparable sale 1 states "windows, . . . in as-is condition." However, as noted above, the new






windows were installed throughout the subject property as part of the renovations and restoration.

Finally, the court notes that the listing for plaintiffs' 2022 comparable sale 2 states "updated kitchen," however, no renovations or improvements to any bathrooms were identified. Moreover, the listing states "some newer windows," while the subject property possesses all new windows. In addition, the court's review of plaintiffs' 2022 comparable sale 2's property record card discloses an "average" interior condition and an effective age of 1999, while the subject property's property record card reflects an interior condition as "excellent" and effective age of 2015.

However, plaintiffs offered no market data or evidence permitting the court to gauge and apply the appropriate condition adjustments to the plaintiffs' comparable sales.

Accordingly, the court finds plaintiffs' 2021 comparable sales 1, 2, 3, and 4 are not credible evidence of the subject property's true or market value. Moreover, the court finds Mr. Librizzi presented credible testimony regarding how the subject property's 2021 tax year added assessment was arrived at. Therefore, for the above-stated reasons the court affirms the subject property's 2021 tax year added assessment.

In addition, the court finds plaintiffs' 2022 comparable sales 1 and 2, to be flawed and not credible evidence of the subject property's true or market value, as of the October 1, 2021 valuation date.

### 3. Size

The court highlights that plaintiffs' 2022 comparable sale 3, 54 Tuxedo Road, shares several key and meaningful attributes with the subject property. Like the subject property, 54 Tuxedo Road is located approximately 0.4 miles from a commuter rail station. The subject property has a lot size of 0.27-acres and 54 Tuxedo Road has a lot size of 0.22-acres. The listing






for 54 Tuxedo Road states that it was "completely renovated." Moreover, according to the listing, 54 Tuxedo Road features 3 full bathrooms and 1 half-bathroom above grade-level, like the subject property. The subject property and 54 Tuxedo Road each similarly feature a detached 2-car garage. The subject property's property record card and 54 Tuxedo Road's property record card each reflect an effective age of 2015. In addition, the court's review of the property record card does not disclose the existence of any "NU" code, designating the sale transaction as non-useable for the Director, Division of Taxation's sales-ratio study. Finally, the subject property sold at a price of $378.69 per square foot, and 54 Tuxedo Road sold at a price of $338.85 per square foot.

The court must acknowledge however, that there is one difference between the subject property and 54 Tuxedo Road. The subject property contains 3,248 square feet of gross living area, while 54 Tuxedo Road possesses only 2,898 square feet of gross living area. However, the court finds that the notable and marked similarities between the subject property and 54 Tuxedo Road outweigh the relatively nominal 350 square foot living area difference.[12]

Therefore, the court finds that 54 Tuxedo Road is credible evidence of the subject property's true or market value as of the October 1, 2021 valuation date.

    4.    Montclair's expert's adjustments

After researching the marketplace and collecting data, an appraiser must scrutinize the data by focusing on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal of Real Estate at 378. The appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market

---

[12] For reasons later expressed herein, the court rejects Montclair's expert's gross living area paired sales analysis and corresponding gross living area adjustment.





evidence." Id. at 390. Adjustments "must have a foundation obtained from the market" and not be based merely on subjective observations and/or personal experience. Greenblatt, 26 N.J. Tax at 55. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn between the properties, and the objective market data utilized to support any adjustments thereto. The weight to be accorded expert testimony relative to adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980) (citing City of Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)).

Here, the court's findings turn on issues of quantity and quality. Specifically, an analysis of the quantity of the adjustments applied by Montclair's expert to each comparable sale rendering it like the subject property. In addition, the court focuses on the quality or reasonableness of the adjustments applied, which adjustments must be supported by credible, market derived data. A fundamental predicate of the comparable sales approach requires that the evidence "be based on 'sound theory and objective data', rather than on mere wishful thinking." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y.2d 179, 188 (1998)).

As detailed above, Montclair's expert relied on four comparable sales. However, the court emphasizes that Montclair's expert's comparable sales 1, 2, and 3 required upwards adjustments of between $259,200 to $315,400, or approximately 25% to 34% of their purchase price to account for perceived differences with the subject property. Most notably, Montclair's expert's comparable sales 1, 2, and 3 contained between 1,071 to 1,289 square feet less gross living area than the subject property and were approximately 33% to 40% smaller than the subject property. Given that plaintiffs, self-represented litigants, were able to identify and present evidence of three single-family residences sold in Montclair possessing gross living areas ranging only between 103






to 350 square feet difference from the subject property, the court questions the suitability of Montclair's expert's comparable sales 1, 2, and 3 for purposes of comparison with the subject property.

To support his gross living area adjustment, Montclair's expert conducted a paired sales analysis. As soundly expressed by Judge Fiamingo, a "paired sales may be helpful to determine the difference in value of a single difference when two properties are equivalent in all respects but one. 'Paired data analysis should be developed with extreme care to ensure that the properties are truly comparable and that other differences do not exist' . . . Care must be taken 'when relying on pairs of adjusted prices because the difference measured may not represent the actual difference in value to the characteristic being studied.'" Palisadium Management Corp. v. Borough of Cliffside Park, 29 N.J. Tax 245, 272 (Tax 2016) (quoting The Appraisal of Real Estate at 398), aff'd, 456 N.J. Super. 293 (App. Div. 2018) (emphasis added).

Montclair's expert testified that, to discern his gross living area adjustment, he conducted a paired sales analysis of two single-family residences that recently sold in Montclair: (i) 202 Watchung Avenue, Montclair; and (ii) 47 Woodland Avenue, Montclair. According to Montclair's expert, the residences sold within four months of each other, each possessed a 1-car garage, each possessed a similar lot size, and each possessed a similar number of full and half bathrooms. In his opinion, the only distinguishing factor was their gross living area, 202 Watchung Avenue allegedly possessing 2,237 square feet of living area, and 47 Woodland Avenue allegedly possessing 1,959 square feet of living area. Thus, Montclair's expert attributed the $57,500 difference in sale price between the two properties to the 278 square foot difference in gross living area, for a value of $206.83 per square foot of gross living area. Montclair's expert then applied a $200.00 per square foot gross living area adjustment to his comparable sales to account for any






gross living area differences.

However, effective cross examination of Montclair's expert disclosed potential material discrepancies and inconsistencies in the reported gross living area of 47 Woodland Avenue. Specifically, Montclair's property record card recited that 47 Woodland Avenue possessed 1,959 square feet of gross living area, while the Garden State multiple listing and floorplans annexed thereto reflected that 47 Woodland Avenue contains approximately 2,300 square feet of gross living area.

Although Montclair's expert acknowledged that he possessed and reviewed the Garden State multiple listing and floorplans for 47 Woodland Avenue reciting approximately 2,300 square feet of gross living area, Montclair's expert testified that he "wouldn't accept the square footage on the multiple listing over the property record card that I have." According to Montclair's expert in performing his paired sales analysis, "I utilized the livable area of the property, which is 1,959 square feet, which I believe includes the finished attic." Montclair's expert further stated, "I was aware of the floorplans that were in the multiple listing service, but I do not know who prepared those, and who did the measurements and if the measurements are even accurate, so I went with the property record card."

However, Montclair's expert seemingly made no investigation to reconcile the discrepancies and inconsistencies that he observed. Montclair's expert apparently made no inquiry into Montclair's records to ascertain whether Montclair's property record card was accurate or whether the floorplans attached to the Garden State multiple listing reflected new improvements and living areas that were not accounted for on the property record card.

During cross-examination, Montclair's expert further acknowledged that he possessed interior photographs, from the Garden State multiple listing, showing one of the bedrooms and the






full bathroom apparently constructed in the finished attic of 47 Woodland Avenue property. Thus, despite observing that the photographs and the floorplans evidenced a living area in the finished attic of approximately 500 square feet, while the property record card reflected a finished attic living area of only 199 square feet, Montclair's expert blindly accepted the property record card and did not investigate these irregularities before using 47 Woodland Avenue in his gross living area paired sale analysis.

Moreover, cross-examination further revealed that according to Montclair's Building Department records, in or about February 2021, building permits were approved for the construction of a "12' x 23' addition on the back and renovation/alteration existing house as per plans" to the 47 Woodland Avenue property. Pursuant to those same records, a Certificate of Occupancy for 47 Woodland Avenue was issued on November 5, 2021.

Significantly, Montclair's municipal tax assessor, George Librizzi, CTA, had earlier offered credible testimony during trial that Montclair retains Hendricks Appraisal Company, LLC to conduct field inspections of each residential property after a Certificate of Approval is issued to examine the scope and nature of the additions, alterations, and improvements. Mr. Librizzi further added that when access to a property is not provided, his office reviews the building plans to estimate or attempt to discern the scope of the renovations and improvements, for purposes of levying an added assessment.

Yet, during cross-examination, Montclair's expert (who is a principal in Hendricks Appraisal Company, LLC) admitted that he did not conduct an interior inspection of 47 Woodland Avenue and conducted only an exterior inspection. Thus, the court questions whether any representative of Montclair's municipal tax assessor conducted an interior inspection of 47 Woodland Avenue after the renovations and improvements were completed.






The court further highlights that its review of 47 Woodland Avenue's property record card discloses that the data and information contained on the property record card was "Estimated." Thus, it appears that no interior inspection was performed by or on behalf of Montclair's municipal tax assessor after the improvements and renovations were completed, when 47 Woodland Avenue's property record card was updated. In sum, Montclair's expert's gross living area paired sale analysis was entirely premised on the "Estimated" gross living area of 47 Woodland Avenue and not from a physical inspection.[13]

Accordingly, for the above-stated reasons, the court finds Montclair's expert's gross living area paired sale analysis unreliable and his gross living area adjustments untrustworthy. Therefore, due to the material discrepancies in gross living area between the subject property and Montclair's expert's comparable sales 1, 2, and 3, the court is unable to account for their differences appropriately and accurately. As such, the court finds Montclair's expert's comparable sales 1, 2, and 3 are not credible evidence of the subject property's true or market value as of the October 1, 2021 valuation date.

However, the court finds that Montclair's expert's comparable sale 4, 26 Draper Terrace, shares several key and meaningful attributes with the subject property. Like the subject property, 26 Draper Terrace was constructed in 1897 and was fully renovated in 2017. 26 Draper Terrace features 5 bedrooms, 3 full bathrooms, and 1 half-bathroom above grade-level, like the subject property. The subject property and 26 Draper Terrace each feature a laundry area/mudroom, renovated kitchen with granite or quartz countertops, stainless steel appliances, and a large center

---

[13] Cross examination further disclosed that 202 Watchung Avenue and 47 Woodland Avenue are in different sections or areas of Montclair. 202 Watchung Avenue is on the border of Montclair and Upper Montclair, while 47 Woodland Avenue is approximately two blocks from the subject property, across from Glenfield Park.






island. The subject property and 26 Draper Terrace each similarly feature a large front porch and detached 2-car garage. The subject property possesses 3,248 square feet of gross living area and 26 Draper Terrace possesses 3,328 square feet of gross living area. Finally, the subject property sold at a price of $378.69 per square foot of gross living area and 26 Draper Terrace sold at a price of $405.63 per square foot of gross living area. The court finds that the notable parallels and marked similarities between the subject property and 26 Draper Terrace outweighs the nominal 80 square foot living area difference.

Therefore, the court finds that Montclair's expert's comparable sale 4, 26 Draper Terrace, is competent and credible evidence of the subject property's true or market value as of the October 1, 2021 valuation date.

### 5. Reconciliation/conclusion of true or market value

"The trial judge as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Twp., 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)).

For the reasons expressed above, the court finds plaintiffs' March 4, 2021 purchase of the subject property, plaintiffs' 2022 comparable sale 3 (54 Tuxedo Road), and Montclair's expert's comparable sale 4 (26 Draper Terrace) to be credible evidence of the subject property's true or market value as of the October 1, 2021 valuation date.

Affording the greatest weight to the subject property's purchase price, per square foot ($378.69), but also giving some measure of consideration to the price, per square foot, of the above-referenced two comparable sales ($338.85 and $405.63), the court concludes the subject property's true market value, as of the October 1, 2021 valuation date, is $1,230,000.






6.    Application of Chapter 123 Ratio

Having reached a conclusion of the subject property's true or market value, the court will turn its attention to a determination of the correct assessment for the 2022 tax year.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ."  N.J.S.A. 54:51A-6(a).  This process involves application of the Chapter 123 common level range.  N.J.S.A. 54:1-35a(b).  Expressed as a formula, tax assessment/true value = ratio.

For the 2022 tax year, the ratio of assessed value, $1,043,100, to true value, $1,230,000, yields a ratio of 84.80% ($1,043,100/$1,230,000 = 84.80%), which falls squarely between Montclair's 2022 tax year Chapter 123 common level range upper limit (94.92%) and lower limit (70.16%).  Consequently, no reduction in the subject property's 2022 tax year assessment is warranted.

**III.  Conclusion**

Accordingly, for the above-stated reasons, the court affirms the subject property's 2021 tax year added assessment and 2022 tax year assessment and is entering judgments contemporaneously herewith.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




